IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| TIM JORDAN, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. G-06-265 |
| § | |
| SHELL OFFSHORE INC., HELMERICH & § | |
| PAYNE INTERNATIONAL § | |
| DRILLING, CO., HELMERICH & § | |
| PAYNE, INC., & URSA TLP HP #204, § | |
| § | |
| Defendants. § | |

## ORDER DENYING DEFENDANTS' MOTION TO TRANSFER VENUE

Plaintiff Tim Jordan ("Plaintiff") brings this action against Defendants Shell Offshore, Inc. ("Shell"), Helmerich & Payne International Drilling Co., Helmerich & Payne, Inc. (collectively "Helmerich"), and URSA TLP HP #204 ("URSA") for personal injuries allegedly occurring on or about February 21, 2006 while Plaintiff was working on a tension leg platform owned by Shell. Defendants filed their Joint Motion to Transfer Venue, requesting a transfer to the Eastern District of Louisiana. Plaintiff filed a timely Response thereto, and Defendants filed a Reply. The Court, in considering the Motion to Transfer Venue, ordered Plaintiff to supply it with additional briefing regarding the location of the alleged accident and whether Plaintiff is a Jones Act seaman. Defendant filed a Motion for Leave to File a Response to Plaintiff's Additional Briefing, which the Court approved. Plaintiff timely supplied the additional briefing, and Defendant filed a timely Response. The Court has considered the original and additional briefing, and, for the reasons stated below,

Defendants' Motion to Transfer Venue is **DENIED**.[1]

**I. Background**

Plaintiff, a resident of Louisiana, was allegedly injured while in Helmerich's employ on or about February 21, 2006. Plaintiff claims that he endured injuries to his shoulder, elbow, and other parts of his body because Shell improperly stored its mud tanks, which required movement. In Plaintiff's Complaint, he alleges he was injured on URSA, which Plaintiff claims is a vessel. URSA is a tension leg platform located approximately 140 miles southeast of Louisiana on the Outer Continental Shelf in Mississippi Canyon 809. URSA was towed from Curacao to its current location, where it has been attached to the subsoil and seabed since 1999.

The Court requested additional briefing so that it would have the information needed to determine if URSA is a vessel, which could be determinative in the outcome of this Motion. Shell and Helmerich, in their Motion to Transfer Venue, claimed that URSA is not a vessel and that Plaintiff therefore does not qualify as a Jones Act seaman. They did not otherwise question Plaintiff's seaman status. Shell and Helmerich contend that if Plaintiff is not a seaman, his employer is not a proper Defendant. If Shell and Helmerich's contentions have merit, this information, when combined with the facts of this case, greatly impacts the Motion to Transfer Venue analysis.

The Parties have supplied the information requested, and the Court now is able to conduct a proper inquiry regarding whether the Southern District of Texas is the appropriate venue for this action. The Court will first determine if URSA is a vessel. Then, the Court will conduct its Motion to Transfer Venue analysis.

---

[1] The Court does not consider this Order worthy of publication. Accordingly, it has not requested and does not authorize publication.

**II. Analysis**

*A. Is URSA a Vessel?*

    *1. The Old Test.* For many years, trial courts in the Fifth Circuit have relied upon *Gremillion v. Gulf Coast Catering, Inc.* to guide analyses regarding whether floating platforms, floating work barges, and quarterbarges are vessels under the Jones Act. *See Gremillion v. Gulf Coast Catering, Inc.*, 904 F.2d 290, 292–94 (5th Cir. 1990) (examining previous jurisprudence and explaining the characteristics of a Jones Act vessel and non-vessel). Fifth Circuit jurisprudence, including *Gremillion*, instructed that the more attributes of a traditional vessel a waterborne structure had, the more likely it would be deemed a Jones Act vessel. Such attributes included: "(1) navigational aids, (2) lifeboats and other life-saving equipment, (3) a raked bow, (4) bilge pumps, (5) crew quarters, and (6) registration with the Coast Guard as a vessel." *Id.* at 293. Courts also traditionally considered the primary mission of the waterborne structure, whether the owner intended to move the structure regularly, whether the structure could be refloated, and how long the structure had remained stationary. *Id.* In addition to the vessel factors, the *Gremillion* Court enunciated a specific test for the determination of whether dry docks and floating work platforms were non-vessels. Under this test, non-vessels possessed the following attributes:

> (1) The structure is constructed to be used primarily as a work platform;
> (2) the structure is moored or otherwise secured at the time of the accident; and
> (3) although the platform is capable of movement, and is sometimes moved across navigable waters in the course of normal operations, any transportation function is merely incidental to the platforms primary purpose.

*Id.* (quoting *Daniel v. Ergon, Inc.*, 892 F.2d 403, 407 (5th Cir. 1990)). In *Gremillion*, a quarterbarge that lacked self-propulsion, provided messing, sleeping, and recreational facilities for oil company personnel, and was spudded down to the seafloor was deemed a non-vessel. *Id.* at 291 n.2. If the

3

Court were to use tests outlined in *Gremillion* in the instant case, the Court would likely find that URSA is not a vessel. However, the tide has changed with regard to the definition of a "vessel" and "non-vessel" under the Jones Act.

*2. A New Direction.* The Supreme Court, in *Stewart v. Dutra Constr. Co.*, clarified that the term "vessel," as used in the Longshore Harbor Workers' Compensation Act (LHWCA) and the Jones Act, is defined in 1 U.S.C. § 3, which reads: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *See Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 125 S. Ct. 1118, 160 L. Ed. 2d 932 (2005). The Court reasoned that "in the 1920's, [when the LHWCA and Jones Act became law], it was settled that § 3 defined 'vessel' for their purposes, and that a structure's status as a vessel under § 3 depended on whether the structure was an instrument of naval transportation." *Id.* at 482–83, 125 S. Ct. at 1119–20. The Fifth Circuit, in *Holmes v. Atlantic Sounding Co.*, acknowledged that "§ 3 clearly controls the definition of 'vessel' for purposes of both acts," and that *Stewart* significantly broadened "the set of unconventional watercraft that must be deemed vessels." 437 F.3d 441, 448 (5th Cir. 2006).

The question that comes before this Court today is just how far *Stewart* and *Holmes* have broadened the definition of "vessel." In *Stewart*, the dredge that the Supreme Court declared to be a vessel under § 3 was "a massive floating platform from which a clamshell bucket [wa]s suspended beneath the water." *Stewart*, 543 U.S. at 484, 125 S. Ct. at 1121. It was like a traditional vessel in that it had a captain and a crew, navigational lights, ballast tanks, and a crew dining area. *Id.* However, it was unlike a pre-*Stewart* and pre-*Holmes* vessel because it "ha[d] only limited means of self-propulsion," and it had to be moved long distances by tugboat. *Id.* Furthermore, the dredge's

4

primary purpose was not navigation–it was dredging. *Id.* at 486; 125 S. Ct. at 1122.

In *Holmes*, the Fifth Circuit applied *Stewart* to its analysis of whether an unpowered floatable quarterbarge was a vessel. The Fifth Circuit acknowledged that "*Stewart* . . . calls into question the analysis underlying our holding in *Gremillion*" and sought to "determine what effect, if any, *Stewart* has on this aspect of [the Fifth Circuit's] vessel jurisprudence." *Holmes*, 437 F.3d at 443. The *Holmes* quarterbarge was used as a floating dormitory for oil company workers and was towed to different work sites. *Holmes*, 437 F.3d at 443–44. The Fifth Circuit described its vessel-like qualities:

> The [quarterbarge] has a raked bow on each end, and 'two end tanks where the rakes are . . for floatation.' It has a radio that is used primarily to communicate with the dredge. It is equipped with bits or bollards that are used to tie it to the shore or to other vessels or structures. It is sometimes moored by anchors and is equipped with life rings and portable water pumps.

*Id.* at 444. Additionally, it was sometimes moored in navigable water and could only be accessed by boat. *Id.* at 449. The *Holmes* quarterbarge also had many characteristics that have, under *Gremillion*, been considered unvessel-like:

> The [quarterbarge] has never been inspected by or registered with the Coast Guard. It is not intended to transport personnel, equipment, passengers, or cargo, and no evidence in the record reflects that it has ever done so. It is not fitted out with winches, running lights, a radar, a compass, engines, navigational aids, Global Positioning System, lifeboats, or steering equipment such as rudders. It is incapable of self-propulsion; has no captain, engineer, or deckhand; has no bilge pumps or wing tanks; and has never been offshore.

*Id.* Furthermore, it was moored at the time of the alleged incident, and its primary purpose was to house and feed employees during dredging projects. *Id.* at 443–44. The Fifth Circuit, applying the § 3 definition of vessel required by *Stewart*, determined that the *Holmes* quarterbarge was a vessel.

*3. The Current Applicability of* Gremillion *and* Pavone. The Fifth Circuit noted that *Holmes* was distinguished from *Gremillion* "to some extent," because the *Gremillion* quarterbarge "'was

partially sunk into a shoreside mudband.'" *Id.* at 449 (quoting *Gremillion*, 904 F.2d at 291). The Fifth Circuit also distinguished *Holmes* from *Pavone v. Mississippi Riverboat Amusement Corp.*, which is another pre-*Stewart* case that guided trial courts in "vessel" determinations. *Pavone* involved a paddle-wheel gambling boat that was permanently moored to the shore. *Id.* The *Holmes* court concluded that the *Holmes* quarterbarge was different than the *Pavone* gambling boat because the *Pavone* boat was permanently moored to the shore, whereas the *Holmes* quarterbarge was only temporarily moored near a dredge site.[2] *Id.*

The above discussion makes clear that the Fifth Circuit did not overrule its previous jurisprudence regarding vessels. However, the Fifth Circuit explicitly stated that "the class of water-borne structures that are vessels for LHWCA and Jones Act purposes is broader than [the Fifth Circuit has] heretofore held." *Id.* Therefore, trial courts must strike a balance between this broader definition, the characteristics of pre-*Stewart* vessels and non-vessels, and the characteristics of waterborne structures that have been held to be vessels post-*Stewart*. The § 3 definition overshadows the lists of characteristics. *See Stewart*, 543 U.S. at 495, 125 S. Ct. at 1128. Simply, if a waterborne structure is "used, or *capable of being used*, as a means of transportation on water," it is a Jones Act and LHWCA vessel. 1 U.S.C. § 3 (emphasis added); *see Stewart*, 543 U.S. at 495, 125 S. Ct. at 1128; *Holmes*, 437 F.3d at 448 ("[A]s long as a water-borne structure is practically capable of being used

---

[2] Shell and Helmerich point out that the Fifth Circuit has, subsequent to *Stewart*, addressed whether a an indefinitely moored floating casino similar to the *Pavone* gambling boat is a vessel. In an unpublished decision, the Fifth Circuit determined again that such structures are not vessels. *See De La Rosa v. St. Charles Gaming Co.*, 2006 WL 3147506 (5th cir. 2006). The finding is not surprising given that the Supreme Court, in *Stewart*, cited *Pavone* for the proposition that "ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that the may one day sail again." *Stewart*, 534 U.S. at 494, 125 S. Ct. at 1127.

for transportation on navigable waters, it is a 'vessel.'"). Thus, while the characteristics of the *Gremillion* quarterbarge, the *Stewart* dredge, and the *Holmes* quarterbarge instruct the inquiry, a determination whether a waterborne structure is a vessel does not turn on a comparison of features.

However, the Court will compare URSA to the *Holmes* quarterbarge in order to accentuate the similarities of the two waterborne structures. Both URSA and the *Holmes* quarterbarge are incapable of self-propulsion. URSA's vessel-like characteristics include a hull, deck, living quarters, and a permanent crew; the *Holmes* quarterbarge's vessel-like characteristics are that it has a raked bow on each end, a gangway with railings, living quarters, and a crew. URSA floats in navigable waters and is, at it current location, completely inaccessible from the shore except by vessel or helicopter. The *Holmes* quarterbarge has two end tanks used for floatation, but, unlike URSA, it has never been offshore. Finally, URSA has an active ballast system and is heavily regulated by the Coast Guard.[3] The *Holmes* quarterbarge, on the other hand, is not regulated by the Coast Guard. Thus, the *Holmes* quarterbarge is more vessel-like than URSA because it has a raked bow and has been moved from place to place more often than URSA, but URSA is more vessel-like than the *Holmes* quarterbarge because it is actually offshore and is regulated by the Coast Guard.

As stated above, the Fifth Circuit explicitly declined to overrule *Gremillion* and *Pavone* in *Holmes*, so it is necessary to distinguish the instant case from *Gremillion* and *Pavone* if URSA is to be deemed a vessel. URSA is like the *Gremillion* quarterbarge and the *Pavone* gambling boat

---

[3] The Coast Guard considers tension leg platforms such as URSA "Floating Offshore Installations" (FOI). An FOI is "a floating structure that is moored to the sea floor in a semi-permanent manner, to be kept at that location for the primary purpose of producing oil and gas from wells drilled in the ocean floor. These are used in deepwater regions where it is not economical or practical to install fixed (bottom bearing) production platforms." (Pl.'s Add. Briefing Ex. 3.)

because it is, according to Shell and Helmerich, permanently moored.[4] However, it is also easily distinguished from *Gremillion* and *Pavone* because both of those non-vessels were moored to the *shore*. URSA is moored 140 miles from shore—the depth of the water at URSA location is approximately 3,800 feet.

    4. *Is URSA Capable of Being Used for Transportation on Navigable Waters?* Under § 3, URSA must be "practically capable of being used for transportation on navigable waters." *Holmes*, 444 F.3d at 448. Shell and Helmerich emphasize the Supreme Court's assertion that "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* However, taken in context of the Supreme Court's discussion, it appears that the Supreme Court was differentiating watercraft that are capable of transportation from other structures such as wharves, drydocks, and bridges. *See id.* at 493, 125 S. Ct. at 1127. Both cases cited in the paragraph in which the statement was made involve structures that were permanently moored to the shore. *Id.* (citing *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625, 7 S. Ct. 336, 30 L. Ed. 501 (1887) (finding that a drydock that was permanently moored to the banks of the Mississippi river and used for repairing ships was not a vessel) and *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 46 S. Ct. 379, 70 L. Ed. 805 (1926) (finding that a wharfboat that had connections with "the water, electric light, and telephone systems of the city" was not a vessel)). Then, in the next paragraph, the Supreme Court cites *Pavone*, which is discussed above, and *Kathriner v. UNISEA,*

---

[4]Shell and Helmerich's expert claims that URSA "will remain permanently installed at [its current] location for the productive life of its wells which is anticipated to be approximately twenty-five (25) years depending upon reservoir performance." (Ramsey Aff. ¶ 5.) After the well at which URSA is currently positioned discontinues production, the Court assumes that URSA will be towed to a different well and be "permanently installed" again.

*Inc.*, 975 F. 2d 657, 660 (9th Cir. 1992), which involved a ship that was "permanently anchored and tied to a dock." In the instant case, URSA is moored to the ocean floor 140 miles from the shore.

URSA was towed to its current location from Curacao, a distance of over 1,500 miles. Shell and Helmerich's expert claims that URSA "is not intended to be towed or moved from place to place since it was installed and anchored to the sea floor." (Ramsey Aff. ¶ 11.) However, URSA *was* towed or moved to its current location. URSA was then attached to the seabed with an elaborate system of tendon pilings, pipelines, and production risers. Shell and Helmerich's expert claims that URSA will remain so-attached for the remainder of the well's life. Then, it is presumed that URSA will be moved to another well. The inherent mobility of a tension leg platform[5] combined with the actual mobility URSA has undergone and is likely to undergo at some point in the future leads to the conclusion that URSA is "*practically* capable of being used for transportation on navigable waters." *Holmes*, 444 F.3d at 448. As the Supreme Court articulated in *Stewart*:

> A ship long lodged in a drydock or shipyard can again be put to sea, no less than one *permanently moored to* shore or *the ocean floor can be cut loose and made to sail*. The question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one.

*Stewart*, 543 U.S. at 496, 125 S. Ct. at 1128 (emphasis added). Here, URSA is "permanently moored . . . to the ocean floor," but there is no contention that she cannot be "cut loose" and towed to her next location if Shell deems it necessary. Therefore, the Court holds that URSA is a Jones Act vessel.

B. *Motion to Transfer Venue*

Before moving on to the Motion to Transfer Venue analysis, the Court will briefly recap the

---

[5]The Minerals Management of the U.S. Department of the Interior lists "mobility" as one of the advantages of a tension leg platform. (Pl.'s Add. Briefing Ex. 4 at 57.)

facts that are relevant to this portion of the analysis. Plaintiff is a resident of Louisiana. Plaintiff was injured while working on URSA in the Gulf of Mexico, 140 miles southeast of Louisiana. Shell is the owner of URSA, and Helmerich was Plaintiff's employer. Both Shell and Helmerich have extensive operations in Louisiana, but Shell's principal place of business is in Houston, Texas, and Helmerich's principal place of business is in Tulsa, Oklahoma. Shell and Helmerich are both Delaware corporations.

*1. Legal Standard.* The federal venue transfer statute provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (2000). The movant bears the burden of demonstrating to the Court that it should transfer the case. *See Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989) (requiring the movant to make a showing that the forum sought is more convenient); *Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966) ("At the very least, the plaintiff's privilege of choosing venue places the burden on the defendant to demonstrate why the forum should be changed."). In determining whether a venue transfer is warranted, the Court considers the availability and convenience of witnesses and parties; the cost of obtaining attendance of witnesses and other trial expenses; the place of the alleged wrong; the location of pertinent books and records; the possibility of delay and prejudice if transfer is granted; and the plaintiff's choice of forum, which is generally entitled to great deference. *See, e.g.*, *Dupre v. Spanier Marine Corp.*, 810 F. Supp. 823, 825 (S.D. Tex. 1993); *Continental Airlines, Inc. v. American Airlines, Inc.*, 805 F. Supp. 1392, 1395–96 (S.D. Tex. 1992). The decision to transfer a case lies within the sound discretion of the Court, and such determinations are reviewed under an abuse of discretion standard. *See Peteet*, 868 F.2d at 1436.

*2. Availability and Convenience of Witnesses and Parties.* "The availability and convenience of witnesses is arguably the most important of the factors" in the § 1404 analysis. *LeBouef v. Gulf Operators, Inc.*, 20 F. Supp. 2d 1057, 1060 (S.D. Tex. 1998) (citing 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3851, at 415 (1986)). To support a Motion to Transfer on this ground, the movant must identify key witnesses and provide a brief outline of their likely testimony. *See id.* (citing *Dupre*, 810 F. Supp. at 825). "The convenience of one key witness may outweigh the convenience of numerous less important witnesses." *Id.*

In the instant case, this factor is the main reason for the above analysis regarding Plaintiff's seaman status. Shell and Helmerich contend that numerous witnesses reside within Louisiana or within the Eastern District of Louisiana's subpoena power, and they provided the Court with a brief summary of the expected testimony of said witnesses. It is clear from the expected testimony synopses provided that many of the cited witnesses are key witnesses. However, most of the cited witnesses are in the employ of either Shell or Helmerich. The convenience of key witnesses who are employees of defendants "is entitled to less weight because [defendants] will be able to compel their testimony at trial." *Continental Airlines*, 805 F. Supp. at 1397. Because both Shell and Helmerich are appropriate defendants in this action due to Plaintiff's seaman status, the convenience of their employees does not bear much weight in the analysis. If Shell and Helmerich had shown that URSA is not a vessel and that, consequently, Helmerich should not be a defendant, then this factor would have considerably more weight.

Shell and Helmerich also contend that Plaintiff's initial treating physicians reside in Louisiana and cannot be compelled to testify. However, their testimony will be at best inconclusive and can easily be preserved by other means as the Court liberally construes Fed. R. Civ. P. 32 to allow

depositions wherever convenient. Furthermore, Plaintiff's current treating physician resides in Texas. Thus, the Court finds that the availability and convenience of key witnesses factor does not weigh in favor of transfer.

Next, the Court turns its inquiry to the availability and convenience of the parties. Plaintiff chose this forum, so it is assumed that he finds it convenient. As stated above, Shell's principal place of business is in Houston, Texas. Helmerich's principal place of business is in Oklahoma. While Shell and Helmerich both have extensive operations in Louisiana, they also both have operations in Texas. Thus, the Court does not find it credible that Texas is a less convenient forum for either Shell or Helmerich. Therefore, this factor does not weigh in favor of transfer.

*3. Cost of Obtaining the Attendance of Witnesses and Other Trial Expenses.* Parties to litigation face unavoidable costs in almost every case that goes to trial. *Robertson v. M/V Cape Hunter*, 979 F. Supp. 1105, 1108 (S.D. Tex. 1997). Furthermore, it is "rare that the forum in which the case is litigated is the most convenient for all the parties involved." *Id.* So, while the costs of obtaining the attendance of witnesses and other trial expenses is a factor in the transfer analysis, it is not a substantial factor.

Shell and Helmerich argue that trial in Louisiana would be more cost efficient than trial in Texas. Certainly all of the witnesses that reside in Louisiana will have more travel expenses if the trial were held in Texas than if it were held in Louisiana. However, Shell's corporate representatives and Plaintiff's initial treating physician will incur additional travel expenses if the trial is held in Louisiana. It is difficult to ascertain whether the Mississippi witnesses and Helmerich's corporate representatives will incur additional travel expenses because they will be required to travel to either location. Clearly, either location will cause additional expenses for some of the witnesses or Parties.

Thus, the Court finds that this factor does not bear significant weight for either side.

    4. *Location of Books and Records.*  The location of books and records is generally of little importance in personal injury cases. Shell and Helmerich contend that the majority of the documents and other business records relevant to this case are located in Louisiana. However, they have not given the Court any indication that the records located in Louisiana are so voluminous as to cause them to incur substantial cost in transporting them to this Court. *See LeBouef*, 20 F. Supp. 2d at 1060 ("The Court finds little inconvenience inherent in bringing, if necessary, those records to Galveston [from Louisiana]."). Therefore, this factor does not weigh for or against transfer.

    5. *Plaintiff's Choice of Forum.*  Plaintiff's decision to litigate this case in Texas is entitled to great deference. *See Barnett v. Kirby Inland Marine, Inc.*, 202 F. Supp. 2d 664, 670 (S.D. Tex. 2002). Plaintiff's choice of forum is entitled to less deference if Plaintiff does not reside in the forum. *See, e.g.*, *Robertson* 979 F. Supp. at 1109 (finding that a Mississippi plaintiff's choice of the Southern District of Texas was entitled to little or no deference where the case had no connection to the forum). Plaintiff is a resident of Louisiana. Although Plaintiff does not reside in this District, his choice requires some deference unless the case has absolutely no connection to this forum. *See Robertson*, 979 F. Supp. at 1109. The alleged accident occurred on a vessel in the Gulf of Mexico. The citizens of Galveston bear at least some interest in accidents that occur on vessels in the Gulf of Mexico. Furthermore, Shell, the owner of said vessel, is based in Texas. Therefore, the case is connected. This factor weighs slightly in favor of retention.

    6. *Place of the Alleged Wrong.*  The place of the alleged wrong is an important factor in venue determinations. *See Lemery v. Ford Motor Co.*, 244 F. Supp. 2d 720, 732 (S.D. Tex. 2002). In the instant case, the alleged wrong occurred on a tension leg platform 140 miles southeast of Louisiana.

13

According to Plaintiff, Mississippi is the "adjacent state" under the terms of the Outer Continental Shelf Lands Act (OCSLA), but Louisiana is closer to the location of the incident than is Mississippi. Shell and Helmerich argue that the place of the alleged wrong factor weighs heavily in the analysis and, in this case, weighs in favor of transfer to Louisiana. However, rather than concentrating solely on the fact that the alleged accident happened "off the coast of Louisiana" or "adjacent to Mississippi," the Court will focus on the fact that URSA is 140 miles away from any state—deep in the Gulf of Mexico. While this Court has considered the location of a vessel to be relevant when the vessel operates off of the coast of one state and does not "come into the waters of Galveston," *Robertson*, 979 F. Supp. at 1108, URSA technically does not and will not enter the waters of Louisiana or Mississippi in the near future, either. *See United States v. Louisiana*, 363 U.S. 1, 80 S. Ct. 961, 4 L. Ed. 2d 1025 (1960) (declaring that "Texas is entitled to a grant of three leagues from her coast under the Submerged Lands Act," that "Louisiana is entitled to submerged-land rights to a distance no greater than three geographical miles from its coastlines," and that "Mississippi is not entitled to rights in submerged lands lying beyond three geographical miles from its coast"). Thus, the place of the alleged wrong does not bear significant weight for either party.

    7. *Potential for Delay.*  Any transfer will produce some delay, and Plaintiff must show that a transfer at this stage would cause a significant or unusual delay in order for this factor to be relevant. *See In Re: Horseshoe Entertainment*, 337 F.3d 429 (5th Cir. 2002) ("[I]n rare and special circumstances a factor of delay or prejudice might be relevant in deciding the propriety of transfer, but only if such circumstances are established by clear and convincing evidence."). Plaintiff does not contend that transfer would cause a significant delay, so this factor does not bear any weight.

    8. *Motion to Transfer Venue Conclusion.*  In sum, Shell and Helmerich's employees who are

witnesses would likely find it more convenient if the trial were held in the Eastern District of Louisiana. Plaintiff's initial treating physicians likewise would find Louisiana to be a more favorable forum. Conversely, Plaintiff's current treating physician would find Texas to be a more convenient forum. Furthermore, Shell's principal place of business is in Houston, Texas, and the citizens of Texas have a substantial interest in cases involving its companies. Plaintiff chose this forum, and the Court, in exercising its considerable discretion in these matters, finds that a transfer is unwarranted. Thus, Shell and Helmerich's Motion to Transfer Venue is **DENIED**.

### III. Conclusion

For the reasons stated above, Shell and Helmerich's Motion to Transfer Venue is **DENIED**. Each Party is to bear its own taxable costs, expenses, and attorney's fees incurred herein to date.

**IT IS SO ORDERED**.

**DONE** this 10th day of January, 2007, at Galveston, Texas.

_____
Samuel B. Kent
United States District Judge